RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD J. RENTZ,

        *Plaintiff-Appellee,*

PAUL R. LEONARD,

        *Attorney-Appellee,*

B. RANDALL ROACH,

        *Attorney-Appellee,*

    *v.*

DYNASTY APPAREL INDUSTRIES, INC. et al.,
        *Defendants,*

PAUL WARFIELD; JEMESCO, INC.,
    *Defendants-Appellants.*

No. 07-4123

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 96-00205—Walter H. Rice, District Judge.

Argued: December 5, 2008

Decided and Filed: February 11, 2009

Before: MERRITT and MOORE, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Kevin Robert McDermott, SCHOTTENSTEIN, ZOX & DUNN CO., LPA, Columbus, Ohio, for Appellants. B. Randall Roach, MARTIN, McCARTY, RICHMAN & WRIGHT, Fairborn, Ohio, for Appellees. **ON BRIEF:** Kevin Robert McDermott, Daniel M. Anderson, SCHOTTENSTEIN, ZOX & DUNN CO., LPA, Columbus, Ohio, for Appellants. B. Randall Roach, MARTIN, McCARTY, RICHMAN & WRIGHT, Fairborn, Ohio, Christopher Jon Cornyn, Springboro, Ohio, for Appellees. Paul R. Leonard, Centerville, Ohio, pro se.

---

[*] Although Judge Cole was originally assigned by the Clerk's Office to this case, he recused himself before oral argument and has not participated in the decision of this case.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Paul Warfield and his company, Jemesco, Inc., (collectively, "the Warfield Defendants") appeal the district court's decision awarding them monetary sanctions against Paul R. Leonard and B. Randall Roach, counsel for Richard J. Rentz, the plaintiff in the underlying litigation.  In 1999, the district court determined that Leonard and Roach had violated Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 by litigating several of Rentz's claims set forth in an amended complaint that lacked any basis in fact.  In 2007, the district court reduced the amount of potential attorney fees from that which was originally requested by Warfield as sanctions, approximately $70,000, to a total of $29,294.87 from Leonard, and $3,747.37 from Roach, based on calculations of the amount of attorney fees actually caused by the sanctionable conduct.  The district court then further reduced the amount of sanctions and ultimately awarded to the Warfield Defendants only $2,500 from Leonard and $250 from Roach.  The district court did not sanction Rentz or the relevant law firms.

On appeal, the Warfield Defendants argue that the district court abused its discretion by (1) failing to sanction one of the law firms, (2) failing to sanction Rentz, and (3) arbitrarily reducing the sanctions against Leonard and Roach to an amount far below the court's own calculation of attorney fees reasonably incurred to litigate Rentz's frivolous claims.  For the reasons explained below, we **AFFIRM** the district court's decision with respect to the first two issues.  Because, however, the district court abused its discretion in further reducing the awards to *de minimis* amounts, we **VACATE** that portion of the district court's order specifying the amount of sanctions and **REMAND** with instructions to the district court to issue an order forthwith imposing sanctions of $29,294.87 against Leonard and $3,747.37 against Roach, to be paid to the Warfield Defendants.

# I.  BACKGROUND[1]

The sanctions at issue in this case arise out of litigation that occurred between 1996 and 1999 involving Rentz, the Warfield Defendants, and Warfield's co-defendants, Armando and Ignacio Mendez (the "Mendez brothers").  The Mendez brothers own and operate a silk-screening and apparel-manufacturing business based in Florida, Dynasty Apparel Industries, Inc. ("Dynasty").  Rentz, a Dayton businessman, first met Armando Mendez while sitting next to him at a World Series game in Cincinnati on October 18, 1990.  Mendez told Rentz that he and his brother ran a sports-apparel-manufacturing business and sought to obtain a license from the National Football League ("NFL") to produce NFL apparel.  Mendez said that he had a standing order from K-Mart for $10 million if he was able to procure an NFL license.  After Rentz told Mendez that he knew someone who might be able to help obtain the license, the two men agreed that if Rentz introduced Mendez to someone who helped him obtain an NFL license, Mendez would pay Rentz a commission of one percent of Dynasty's gross sales of NFL-licensed goods.  Although Rentz and Mendez shook hands on the deal and exchanged telephone numbers, they did not reduce the agreement to writing.  Joint Appendix ("J.A.") at 427-28 (D. Ct. Dec. 2/5/99 at 2-3).

Rentz soon contacted Paul Warfield, a former NFL football player who leased office space from Rentz in Dayton.  Rentz suggested that Warfield might use his connections to the NFL to help the Mendez brothers obtain a license.  Although Rentz prepared a "Letter of Understanding" obligating Warfield to pay Rentz one percent of gross sales of merchandise sold under an NFL license, Warfield never signed an agreement with Rentz.  In late October 1990, Rentz arranged a meeting in Dayton between the Mendez brothers and Warfield.  After the Mendez brothers showed Warfield samples of their work, Warfield agreed to seek an NFL license on their behalf.  Although Rentz mentioned his one-percent commission at the meeting, there was no specific discussion of who would pay Rentz.  Following the Dayton meeting, Rentz periodically

---

[1]The following facts, which are undisputed, are drawn largely from the district court's decision of February 5, 1999, on the defendants' motions for summary judgment.

spoke by phone with both Warfield and the Mendez brothers. During one call with Armando Mendez, Rentz repeatedly mentioned the promised one-percent commission, but Mendez suggested that Warfield pay the commission. In November 1990, Warfield met the Mendez brothers in Miami, Florida, and toured Dynasty's production facility. At that meeting, Warfield told Armando Mendez that Rentz was not Warfield's partner and told the Mendez brothers that they would have to pay any commission to Rentz.

In 1991, Warfield and his wife formed the corporation Jemesco, which then entered an agreement with the Mendez brothers' corporation Dynasty to create a joint venture called the Jemesco-Mendez Group. The Jemesco-Mendez Group obtained two NFL licenses in 1991. In February 1991, Armando Mendez told Rentz that the Mendez brothers had obtained an NFL license through a contact other than Warfield, and Rentz assumed that Warfield's efforts had failed. However, several years later, in July 1995, Rentz learned in a newspaper article that Warfield had been in the Florida sports-apparel business since 1990. Rentz concluded that Warfield had obtained an NFL license for the Mendez brothers and that Rentz had been deprived of his one-percent commission.

After Rentz threatened litigation, Warfield filed a declaratory-judgment action against Rentz on May 24, 1996, in the United States District Court for the Southern District of Florida. Rentz then filed a separate action in the United States District Court for the Southern District of Ohio on June 7, 1996, naming as defendants the Mendez brothers, Dynasty (also known as Mendez Screen Printing, Inc.), and the Warfield Defendants. The two actions were subsequently consolidated in the Ohio district court on July 17, 1996.

On March 31, 1997, the district court dismissed several portions of Rentz's complaint but gave him leave to file an amended complaint. Rentz filed an amended complaint on June 5, 1997, alleging various fraud, breach-of-contract, promissory-estoppel, and unjust-enrichment claims against the Mendez brothers, Dynasty, and the Warfield Defendants, and tortious interference with a business relationship against Warfield. On March 30, 1998, the district court dismissed the fraud claims and all of the claims insofar as they were directed against the Mendez brothers individually. The

claims remaining in the case, therefore, were the contract, promissory-estoppel, and unjust-enrichment claims against Dynasty and the Warfield Defendants, and the claim of tortious interference with a business relationship against the Warfield Defendants.

Both Dynasty and the Warfield Defendants subsequently moved for summary judgment on the remaining claims. The Warfield Defendants also filed a motion for sanctions against Rentz, his counsel, and their law firms, pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and OHIO REV. CODE § 2323.51. J.A. at 147-58 (Mot. for Sanctions).[2] On February 5, 1999, the district court granted summary judgment to the Warfield Defendants, but denied summary judgment to Dynasty. J.A. at 426-71 (Dist. Ct. Dec. 2/5/99 at 1-46).[3]

The district court also found Rentz's counsel subject to sanctions under both Rule 11 and 28 U.S.C. § 1927, but it denied the motion for sanctions under OHIO REV. CODE § 2323.51 as "moot." J.A. at 472-80 (Dist. Ct. Dec. 2/5/99 at 47-55). Specifically, the court found that Rentz's November 1996 deposition testimony revealed that there was no evidentiary basis for the allegations and legal claims that Rentz continued to make against the Warfield Defendants in his amended complaint, filed on June 5, 1997, and in his opposition to the defendants' motions for summary judgment, filed on August 26, 1998.

The district court explained that throughout his deposition Rentz had repeatedly denied the existence of any agreement requiring the Warfield Defendants to compensate him. The court noted the following statements by Rentz at his deposition: (1) "I did not care where [the one-percent commission] came from, but I dealt with the Mendez

---

[2]The Warfield Defendants complied with Rule 11's "safe harbor" provision requiring that a party seeking sanctions first serve the motion on the opposing party and then wait at least twenty-one days (or another period designated by the court) before filing the motion with the court. *See* FED. R. CIV. P. 11(c)(2). The Warfield Defendants served the motion for sanctions on Rentz and his attorneys on April 15, 1998, and then filed the motion in the district court on May 11, 1998. J.A. at 158 (Certificate of Service).

[3]Rentz proceeded to a jury trial against Dynasty on the remaining claims, and on May 27, 1999, the district court entered a judgment awarding Rentz $629,529.85 in damages and declaring that "the contract remains in full force and effect until the time when the Dynasty/Jemesco NFL Licensing Agreement ceases." J.A. at 486 (Judgment).

brothers. That is who I made the deal with." J.A. at 707 (Rentz Dep. Tr. at 44); (2) "I was not partners with Mr. Warfield. Mine would be coming from the Mendez brothers." J.A. at 708 (Rentz Dep. Tr. at 45); (3) "I didn't feel my deal was with Paul Warfield." J.A. at 710 (Rentz Dep. Tr. at 49). The district court also cited the following testimony in which Rentz, after repeated questioning, acknowledged that neither Jemesco nor Warfield personally ever agreed to pay Rentz's one-percent commission:

> Q:     Did Jemesco ever obligate itself to pay you a dime?
> A:     No.
> Q:     Did Mr. Warfield ever obligate himself to pay you a dime?
> A:     Yes.
> Q:     When did he say he was going to pay you?
> A:     He knew the essence of the deal. When I talked to him, he knew I was involved. When I first brought the deal to him, he knew I was involved.
> Q:     Did he ever obligate himself to ever pay you?
> A:     The deal was presented to him. He knew the deal. The obligation was in the presentation from me and to him doing the deal.
> Q:     Who was paying the one percent?
> A:     It was coming out of the deal.
> Q:     Who was going to pay you one percent?
> A:     I suppose Mendez was.

J.A. at 711-12 (Rentz Dep. Tr. at 129-30). Although ruling that Rentz's testimony demonstrated subsequent attorney misconduct warranting sanctions, the district court concluded that an evidentiary hearing was necessary to determine both the proper amount of sanctions and the proper litigants to be sanctioned. J.A. at 478 (Dist. Ct. Dec. 2/5/99 at 53).

In October 1999, the district court held a hearing on the Warfield Defendants' motion for sanctions. At that hearing, the Warfield Defendants specified that they sought the imposition of Rule 11 sanctions on (1) Rentz himself; (2) Rentz's attorneys, Paul R. Leonard ("Leonard") and B. Randall Roach ("Roach");[4] and (3) two of the law

---

[4]The Warfield Defendants also sought sanctions pursuant to 28 U.S.C. § 1927 against the two attorneys.

firms with which Leonard and Roach practiced during the litigation, Leonard & Roach[5] and Cornyn, Leonard & Hughes. J.A. at 588 (Dist. Ct. Dec. 8/9/07 at 2). The Warfield Defendants requested that the district court impose monetary sanctions of some $70,000 to compensate them for the attorney fees that they incurred litigating the case. *Id.* Between November 1999 and February 2000, the parties submitted post-hearing briefs on the issues of who should be sanctioned and what amount of sanctions should be imposed.

More than seven years later, on August 9, 2007, the district court finally issued a ruling on these issues. The court found that only Leonard and Roach were subject to sanctions and imposed monetary sanctions on each of the two attorneys pursuant to both Rule 11 and 28 U.S.C. § 1927. J.A. at 589-600 (Dist. Ct. Dec. 8/9/07 at 3-14). The court explained that Leonard had filed the amended complaint in which certain claims against Warfield were "controverted by Rentz's deposition testimony." J.A. at 593 (Dist. Ct. Dec. 8/9/07 at 7). Similarly, Roach had prepared and filed a memorandum opposing the Warfield Defendants' motion for summary judgment even though Rentz's prior deposition testimony had made clear that most of the claims against Warfield had no evidentiary basis. J.A. at 594-96 (Dist. Ct. Dec. 8/9/07 at 8-10). The district court, however, denied the Warfield Defendants' request that it also sanction Rentz personally and the law firms with which Leonard and Roach practiced during the relevant period.

Next, the district court calculated the attorney fees reasonably incurred by the Warfield Defendants due to the sanctionable conduct of Leonard and of Roach. Beginning with the $70,458.25 in total attorney fees claimed by the Warfield Defendants, the court made a series of specific deductions, including deductions for fees unrelated to the frivolous claims. The court concluded that the Warfield Defendants would be reasonably compensated by an award of $29,294.87 for the attorney fees incurred due to Leonard's sanctionable conduct and $3,747.37 due to Roach's

---

[5]The Warfield Defendants did not appeal the district court's ruling that "agency principles do not support the imposition of Rule 11 sanctions" on the law firm Leonard & Roach because the evidence showed that the two attorneys did not form a partnership but rather "operated as an association of independent practitioners." J.A. at 597 (Dist. Ct. Dec. 8/9/07 at 11).

sanctionable conduct.  J.A. at 605-11 (Dist. Ct. Dec. 8/9/07 at 19-25).  However, the district court then proceeded to reduce these amounts by more than ninety percent, ordering that Leonard and Roach pay just $2,500 and $250 respectively to the Warfield Defendants.  In so doing, the district court observed that deterrence and punishment, rather than compensation for fees, were the primary goals of both Rule 11 and § 1927 and concluded that these goals would be sufficiently served by the imposition of sanctions in the reduced amounts.

## II.  ANALYSIS

We review for abuse of discretion a district court's determination of sanctions under either Rule 11 or under 28 U.S.C. § 1927. *Ridder v. City of Springfield*, 109 F.3d 288, 293, 298 (6th Cir. 1997), *cert. denied*, 522 U.S. 1046 (1998).  "A court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *Id.* at 293 (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

Originally enacted in 1937, Rule 11 was substantially revised in 1983 and again in 1993, and stylistically revised in 2007.  The 1993 amendments "broaden[ed] the scope of attorney obligations but place[d] greater constraints on the imposition of sanctions."  *Id.*  Under the current version of the amended rule:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)  it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)  the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)  the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED. R. CIV. P. 11(b).  The amended rule imposes on litigants a "continuing duty of candor," and a litigant may be sanctioned "for continuing to insist upon a position that is no longer tenable." *Ridder*, 109 F.3d at 293.  Whereas the pre-1993 rule made the imposition of sanctions for violations mandatory, sanctions are discretionary under the amended rule.  *See* FED. R. CIV. P. 11(c)(1).  Further, any sanctions imposed "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  FED. R. CIV. P. 11(c)(4).

The amended rule also "de-emphasizes monetary sanctions and discourages direct payouts to the opposing party." *Ridder*, 109 F.3d at 294 (citing FED. R. CIV. P. 11 Advisory Committee Notes (1993 Amendments)).  The amended rule recognizes, however, that "under unusual circumstances . . . deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation." FED. R. CIV. P. 11 Advisory Committee Notes (1993 Amendments).  Accordingly, Rule 11 expressly provides that "if imposed on motion and warranted for effective deterrence," sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  FED. R. CIV. P. 11(c)(4).

Unlike Rule 11, 28 U.S.C. § 1927 authorizes the imposition of sanctions on only an "attorney or other person admitted to conduct cases."[6]  Section 1927 allows a court to require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  We have held that a court may sanction an attorney under § 1927 for unreasonably and vexatiously

---

[6]Accordingly, § 1927 does not authorize the imposition of sanctions on a represented party, nor does it authorize the imposition of sanctions on a law firm.  *Claiborne v. Wisdom*, 414 F.3d 715, 722-24 (7th Cir. 2005), *cert. dismissed*, 546 U.S. 1162 (2006).

multiplying the proceedings "despite the absence of any conscious impropriety." *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)). An attorney is therefore sanctionable under § 1927 "without a finding of bad faith, 'at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims.'" *Ridder*, 109 F.3d at 298 (quoting *Jones*, 789 F.2d at 1230). However, "'[t]here must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Id.* (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)). Under this objective standard, "§ 1927 sanctions require a showing of something less than subjective bad faith, but something more than negligence or incompetence." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006).

## A. Decision Not to Impose Rule 11 Sanctions on Law Firm

The Warfield Defendants argue that the district court erred in failing to hold the law firm Cornyn, Leonard & Hughes ("CL&H") jointly responsible under Rule 11 for the sanctionable conduct of Leonard and Roach. Rule 11(c)(1) provides that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." FED. R. CIV. P. 11(c)(1). With this provision the 1993 amendments specifically departed from *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 126-27 (1989), in which the Supreme Court held that a law firm may not be sanctioned under Rule 11 for a violation by one of its attorneys. The advisory committee notes to the 1993 amendments explain that "it is appropriate that the law firm ordinarily be viewed as jointly responsible [for its attorney's Rule 11 violations] under established principles of agency." FED. R. CIV. P. 11 Advisory Committee Notes (1993 Amendments). However, neither the text of the rule nor the advisory committee notes shed light on what constitutes "exceptional circumstances." The Warfield Defendants contend that the district court's finding of

exceptional circumstances as to CL&H amounted to an abuse of discretion. We disagree.

In April 1997, both Leonard and Roach began to practice law with Christopher Cornyn ("Cornyn") and began receiving paychecks from the law firm Cornyn, Leonard and Hughes ("CL&H"). At that time, Rentz's suit had been pending for around nine months. Approximately two months later, on June 5, 1997, Leonard filed the amended complaint for which he was later sanctioned. Leonard left CL&H later that year, in December 2007, after a dispute with Cornyn, but Roach stayed on to practice in Cornyn's firm, which was then called Cornyn, Roach & Hughes. Although Leonard testified that he had only minimal involvement with the case after leaving CL&H, both Leonard and Roach remained counsel of record on the district court docket until February 1999, when Leonard was replaced as trial counsel by Cornyn.

The district court declined to sanction CL&H under Rule 11 because it found that, even assuming that Leonard and Roach were acting as agents for the firm, the case "remained first and foremost the responsibility of Leonard and to a lesser extent that of Roach," and "[t]here was no evidence that Cornyn or Hughes was involved in the drafting or filing of [the amended complaint]." J.A. at 598 (Dist. Ct. Dec. 8/9/07 at 12). The court added that "Leonard affixed only his name to the Amended Complaint, rather than identifying himself as part of Cornyn, Leonard and Hughes." *Id.* The Warfield Defendants counter that Leonard and Roach were employees of CL&H when the amended complaint was filed and that Cornyn should be held responsible for failing adequately to supervise the case. They contend that "Cornyn allowed the resources of his law firm as wielded by Leonard and Roach to inflict harm and damage upon [the Warfield Defendants] without any attempt to manage or correct their improper conduct." Warfield Br. at 22.

The district court did not abuse its discretion by declining to hold the law firm CL&H jointly responsible for the misconduct of Leonard and Roach. First, there is no evidence that Cornyn had any contact with the Rentz case or was involved in either a supervisory or managerial capacity until Cornyn replaced Leonard as counsel of record

in February 1999, well after the sanctionable conduct occurred. Instead, there was a general understanding among the three attorneys that Roach and Leonard would continue to maintain sole responsibility for the Rentz case when they joined Cornyn and Hughes to form CL&H. Cornyn stated that when Roach and Leonard joined CL&H in early 1997 "[i]t was fairly clear in everyone's understanding that, since it was ongoing litigation, that was their case and they would handle that action independent of me." J.A. at 621 (Cornyn Tr. at 37). Consistent with this understanding, when Leonard filed the amended complaint soon after joining CL&H, the certificate of service did not identify him as a member of CL&H. J.A. at 38. Indeed, the only evident connection that Cornyn or CL&H had with the Rentz case at the time of the sanctionable conduct was the appearance of the firm's name on the letterhead of correspondence involving the Rentz case. In sum, the record makes clear that the Rentz case was solely the responsibility of Leonard and Roach during the relevant period, that Cornyn had no involvement with the case until well after the sanctionable conduct had occurred, and that the three attorneys had an understanding that when Leonard and Roach joined Cornyn they would handle the Rentz case independent of Cornyn. Given the tenuous connection between the law firm CL&H and the Rentz case at the time of the sanctionable conduct, we cannot say that the district court abused its discretion by refusing to sanction CL&H.

**B. Decision Not to Impose Rule 11 Sanctions on Rentz**

The Warfield Defendants also contend that the district court's decision not to sanction Rentz personally was an abuse of discretion because Rentz was actively involved in the litigation and allowed his attorneys to make allegations against the Warfield Defendants that he knew to be untrue. Rentz acknowledges that he was an active participant in the litigation, attending depositions and reviewing the various pleadings. However, he maintains that he provided consistent and truthful factual statements throughout the litigation and that, as a layperson without legal training, "[h]e was not in a position to evaluate whether the allegations asserted in the two pleadings,

now couched in their legal parlance as distinct legal theories, were equivalent to the accounts he provided of those meetings and events." Rentz Br. at 32.

Rule 11 expressly provides the district court with discretion to impose sanctions on a party that is responsible for the rule's violation, provided that the violation is not one for unwarranted legal contentions under Rule 11(b)(2). *See* FED. R. CIV. P. 11(c)(1) & (c)(5)(A). The advisory committee notes to the 1993 amendments explain that the amended rule "permits the court to consider whether . . . the party itself should be held accountable for [his] part in causing a violation," and to "make an additional inquiry in order to determine whether the sanction should be imposed on . . . parties either in addition to or, in unusual circumstances, instead of the person actually making the presentation to the court." FED. R. CIV. P. 11 Advisory Committee Notes (1993 Amendments). Courts have generally declined to impose sanctions on represented parties. *See* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1336.2 (3d ed. 2004) ("Imposing a sanction on the client has met with disfavor."). However, we have upheld the imposition of Rule 11 sanctions on parties, along with their attorney, when they misrepresented key facts during their depositions and at trial. *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 384-85 (6th Cir. 1997).

As explained previously, the sanctionable conduct in this case was the assertion of claims against the Warfield Defendants that clearly lacked any evidentiary support. Rentz's amended complaint and his memorandum opposing summary judgment contained allegations that Warfield—either individually or in concert with the Mendez brothers—promised to pay Rentz a one-percent commission. Rentz repeatedly acknowledged in his deposition testimony, however, that Warfield never promised or agreed to pay him a commission. The district court sanctioned Rentz's attorneys for continuing to allege that Warfield had promised to pay Rentz a commission when there was no evidence of such a promise. But the district court found that Rentz did not cause his attorneys to violate Rule 11 and therefore declined to impose sanctions on Rentz. The district court explained that:

there is no evidence that Rentz misled his counsel or failed to provide them any requested information concerning his claims against Warfield. On the contrary, the evidence demonstrates that Rentz was forthcoming with his attorneys and opposing counsel. While Rentz believed that Warfield had treated him unfairly, that does not demonstrate that he caused his counsel to violate Rule 11. Moreover, it was his truthful deposition testimony to the effect that Warfield had not agreed to compensate him which led to the dismissal of all claims against that Defendant, as well as the imposition of sanctions by the Court.

J.A. at 599-600 (Dist. Ct. Op. 8/9/2007 at 13-14).

Although the Warfield Defendants maintain that the district court should have held Rentz jointly responsible for permitting his counsel to make the unfounded contentions, we believe that the district court did not abuse its discretion in limiting its assessment of sanctions to Rentz's attorneys. Nothing in the record suggests that Rentz made any false *factual* allegations during the course of this litigation. It is undisputed that Rentz's deposition testimony was accurate and truthful, though contrary to the claims doggedly pursued by his counsel against the Warfield Defendants. Rentz was consistently forthcoming with his attorneys and opposing counsel and provided accurate information about his relationship and discussions with Warfield. If Rentz's attorneys characterized Warfield's statements as constituting a *promise*, or creating a *contract*, it was not unreasonable for Rentz, who lacked any legal training, to trust this professional judgment. Further, the unfounded contentions at issue here were not entirely factual, but rather mixed questions of fact and law for which a non-lawyer such as Rentz should not be held responsible. Accordingly, the district court reasonably determined that Rentz's conduct did not cause his attorneys to violate Rule 11, and we therefore conclude that the district court did not abuse its discretion in declining to sanction Rentz.

## C. Amount of Sanctions

Turning to the amount of sanctions, the Warfield Defendants argue that the district court abused its discretion by arbitrarily reducing the monetary sanctions imposed against Leonard and Roach far below the amount of attorney fees incurred by the Warfield Defendants due to the sanctionable conduct. The Warfield Defendants do

not contest the district court's initial deductions from the $70,458.25 in total attorney fees claimed, to amounts totaling $29,294.87 as to Leonard and $3,747.37 as to Roach, representing the reasonable attorney fees incurred in connection with the sanctionable conduct. However, the Warfield Defendants argue that the district court erred when it made further reductions to impose sanctions of just $2,500 against Leonard and $250 against Roach. They maintain that in further reducing the sanctions award the district court "failed to apply the appropriate factors, failed to adequately explain its decision, and left [the Warfield Defendants] in a worse position than if the Motion for Sanctions had been denied." Warfield Br. at 31. Leonard and Roach counter that the district court properly recognized that the principal goal of both Rule 11 and § 1927 is deterrence and imposed sanctions in the least amount necessary to deter repetition of the sanctionable conduct.[7]

Rule 11(c)(4) sets forth the nature of sanctions that a court may impose for violations of the rule:

> A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; *or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.*

FED. R. CIV. P. 11(c)(4) (emphasis added). Prior to the 1993 amendments to Rule 11, this court held that "[t]he two goals of Rule 11 are deterrence and compensation," with deterrence being the "principal goal." *Jackson v. Law Firm of O'Hara, Ruberg, Osborne & Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989); *see also Danvers v. Danvers*, 959 F.2d 601, 605 (6th Cir. 1992) (stating that the two goals of deterrence and compensation must be "balanced"). However, the advisory committee notes to the 1993 amendments make it clear that under the amended rule "the purpose of Rule 11 sanctions is to deter rather than to compensate." FED. R. CIV. P. 11 Advisory Committee Notes (1993

---

[7]The district court based its sanctions award on both Rule 11 and § 1927. Because we find that the district court abused its discretion in determining the amount of sanctions under Rule 11, we do not reach the question of whether the sanctions award was proper under § 1927.

Amendments).  Still, compensating the victim and deterring the perpetrator of Rule 11 violations are not mutually exclusive.  "If compensation was not a recognizable basis for Rule 11 awards, aggrieved litigants would have little incentive to pursue sanctions thus diminishing the important deterrent effect of Rule 11."  *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 646 (7th Cir. 1992).  The amended rule continues to recognize compensation for attorney fees as a basis for Rule 11 awards.  The plain language of Rule 11 provides that attorney fees may sometimes be "warranted for effective deterrence," FED. R. CIV. P. 11(c)(4), and the advisory committee notes state that "under unusual circumstances . . . deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation," FED. R. CIV. P. 11 Advisory Committee Notes (1993 Amendments).  Thus, although it is clear that Rule 11 is not intended to be a compensatory mechanism in the first instance, it is equally clear that effective deterrence sometimes requires compensating the victim for attorney fees arising from abusive litigation.

Here, we simply cannot see how the district court's sanction awards of $2,500 and $250 against Leonard and Roach respectively are sufficient to meet Rule 11's requirement that sanctions be sufficient "to deter repetition of the conduct or comparable conduct by others similarly situated."  FED. R. CIV. P. 11(c)(4).  Nowhere does the district court explain how the imposition of such minimal monetary penalties on practicing attorneys could serve as an effective deterrent to similar conduct by these attorneys or others similarly situated.  Instead, the district court offered only conclusory explanations for its decision to reduce the sanction awards.

With respect to Leonard, the district court stated, without any real explanation, that "a sanction in the amount of $2,500.00 is sufficient to deter and to punish Leonard for his sanctionable conduct."  J.A. at 610 (Dist. Ct. Dec. 8/9/2007 at 24).  The only apparent rationale offered by the court as to why this amount was sufficient was that "[a]lthough Leonard has been licensed to practice law for a number of years he had only recently returned to private practice, from a long career in the public arena, when he

commenced his representation of Rentz." J.A. at 609-10 (Dist. Ct. Dec. 8/9/2007 at 23-24).[8] We fail to see the relevance of Leonard's career in public service to the issue of the proper amount of sanctions. Leonard has offered no evidence that he lacks the ability to pay sanctions in the amount of the reasonable attorney fees incurred by the Warfield Defendants due to his sanctionable conduct. If the district court means to suggest that an attorney who reenters private practice after a stint in public service should be held to a lesser standard of conduct under Rule 11, we strongly disagree. Rule 11 places an obligation on all attorneys "to conduct a reasonable inquiry into the law and facts before signing pleadings, written motions, and other documents." FED. R. CIV. P. 11 Advisory Committee Notes (1993 Amendments). If an attorney fails to meet this obligation, as did Leonard, he is subject to sanctions sufficient to meet the deterrent goals of Rule 11. Neither the district court nor Leonard has persuasively explained how $2,500 is a sufficient sanction to further the deterrent goals of Rule 11. Not only is this figure less than ten percent of the $29,294.87 in attorney fees reasonably incurred by the Warfield Defendants due to Leonard's sanctionable conduct, it is less than half of the $5,520 incurred by the Warfield Defendants just to litigate the sanctions issues in the district court.

We find the district court's explanation for imposing only a $250 sanction on Roach similarly unpersuasive. Roach's sanctionable conduct was limited to preparing and signing Rentz's memorandum in opposition to summary judgment, which defended several frivolous claims against the Warfield Defendants. The district court calculated that the Warfield Defendants incurred some $3,747.37 in attorney fees due to Roach's sanctionable conduct. Yet, as with Leonard, the district court reduced that amount by more than ninety percent. In concluding that $250 was a sufficient sanction, the court explained that:

> Roach became licensed to practice in the Fall of 1995, and his first professional involvement was his association with Leonard, who was not at that time an experienced practitioner. In this litigation, Roach played

---

[8]Leonard served as Mayor of Dayton from 1982 to 1986 and as Lieutenant Governor of the State of Ohio from 1987 to 1991.

the role of associate to Leonard, the partner. Leonard was responsible for communicating with Rentz, as well as signing papers to be filed in court. Roach would conduct research; he prepared and signed Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment . . . because Leonard told him to do so. Moreover, for many years, Roach, a young practitioner, has had the specter of being required to compensate a party for his attorney's fees, exceeding $70,000. Finally, based upon his testimony during the evidentiary hearing and his post-hearing submission, this Court is convinced that Roach had, by that time, a full understanding of the obligations imposed upon counsel by Rule 11 and § 1927, and that a repetition of this sanctionable conduct is highly unlikely.

J.A. at 611-12 (Dist. Ct. Dec. 8/9/2007 at 25-26). First, we do not see how Roach's experience level or the fact that he was essentially an associate under Leonard's supervision are relevant to determining the amount of sanctions sufficient to serve the deterrent purpose of Rule 11. All attorneys, regardless of experience level or position, are equally subject to Rule 11's obligation to conduct a reasonable inquiry into the law and facts before signing papers filed with the court. We also fail to see the relevance of the fact that Roach has faced uncertainty for many years over the amount he would ultimately be sanctioned for his Rule 11 violation. This seven-year delay—caused by the district court's dilatory ruling on the sanctions issue—has no bearing on the proper amount the two attorneys should be sanctioned. Finally, even if the district court is correct that Roach now has a better understanding of his obligations under Rule 11 and that he is unlikely to repeat the sanctionable conduct, that does not necessarily imply that sanctions of $250 are sufficient in this case. Sanctions imposed under Rule 11 must be sufficient "to deter repetition of the conduct *or comparable conduct by others similarly situated.*" FED. R. CIV. P. 11(c)(4) (emphasis added). Even assuming that the sanctions imposed by the district court are sufficient to deter future misconduct by Roach, we highly doubt that such a token sanction of $250 could effectively deter other attorneys from committing similar violations.

Because we believe that sanctions against Leonard and Roach in the amounts of $2,500 and $250 are insufficient to serve Rule 11's deterrent purposes, we conclude that the district court abused its discretion in imposing sanctions in these amounts. Although

we recognize that the district court has substantial discretion to determine the nature of the sanctions it imposes, we believe that the court here has failed adequately to explain how such small monetary sanctions—particularly in comparison to the amount of attorney fees incurred due to the sanctionable conduct—would satisfy Rule 11's deterrent purposes. We reiterate that compensation and fee-shifting are not the goals of Rule 11. However, we think it clear that the *de minimis* sanctions imposed by the district court here are simply inadequate to deter Rule 11 violations. Victims of Rule 11 violations such as the Warfield Defendants would have no incentive to file a motion for sanctions if their reward for successfully litigating the issue is only a tiny fraction of the amount of expenses incurred because of the sanctionable conduct. Indeed, under the district court's ruling, the Warfield Defendants actually would have lost money by litigating and prevailing on their motion for sanctions because the total sanctions awarded ($2,750) amounted to less than half of the amount spent by the Warfield Defendants in connection with the sanctions hearing ($5,520).

Instead, we believe that sanctions in the amount of the reasonable attorney fees incurred by the Warfield defendants due to the sanctionable conduct constitute the least amount sufficient here to deter future violations. Accordingly, we vacate that portion of the district court's order setting the amount of sanctions at $2,500 as to Leonard and $250 as to Roach, and remand so that the district court may promptly order sanctions of $29,294.87 against Leonard and $3,747.37 against Roach, representing the reasonable attorney fees incurred by the Warfield Defendants due to the sanctionable conduct of each attorney.

Finally, we turn to the Warfield Defendants' argument that the sanctions award should also include interest accrued from the time that entitlement to sanctions was determined by the district court in February 1999. As the Warfield Defendants point out, two other circuits have held that a court may include a "delay factor" as part of a sanctions award in order to account for the opportunity cost of money that could have been allocated to other purposes but instead went to pay attorney fees to defend against frivolous claims. *See FDIC v. Maxxam, Inc.*, 523 F.3d 566, 596 & n.170 (5th Cir. 2008);

*Brandt*, 960 F.2d at 651-52. We note, however, that the Warfield Defendants failed to raise the potential application of a "delay factor" in the district court. To be sure, the Warfield Defendants had no reason in 1999 to expect that it would take the district court more than seven years finally to rule on the amount of sanctions and to determine which litigants to sanction. Nonetheless, it should have been clear even in 1999 that there would be some delay between the district court's ruling that sanctions were warranted (in February 1999) and its final determination of the nature of those sanctions, given that the district court's February 1999 ruling was followed by a hearing on sanctions in October 1999 and then several months of post-hearing briefing. We have observed that "[o]ur function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005) (internal quotation marks omitted). Consequently, "'[i]t is well settled law that this court will not consider an error or issue which could have been raised below but was not.'" *Id.* (quoting *Niecko v. Emro Marketing Co.*, 973 F.2d 1296, 1299 (6th Cir. 1992)). Because the Warfield Defendants did not raise before the district court the issue of whether a "delay factor" should be added to the amount of sanctions imposed, we decline to decide this issue here and do not add accrued interest to the sanctions awards.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision not to sanction the law firm and its decision not to sanction the represented party, Rentz. However, we **VACATE** that portion of the district court's order setting the amount of sanctions against the attorneys and **REMAND** so that the district court may issue an order forthwith imposing sanctions in the amount of $29,294.87 against Leonard and $3,747.37 against Roach, to be paid directly to the Warfield Defendants.